# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| VICKIE LITTS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:15-cv-133 |
| ) | Judge Aleta A. Trauger |
| SUMNER REGIONAL MEDICAL CENTER, ) | |
| LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the defendant (Docket No. 30), to which the plaintiff has filed a Response in opposition (Docket No. 37), and the defendant has filed a Reply (Docket No. 41). For the reasons discussed herein, the motion will be granted.

## BACKGROUND AND PROCEDURAL HISTORY

This employment action arises from the termination of the plaintiff, Vickie Litts, from her employment with the defendant, Sumner Regional Medical Center (the "Hospital"). The action was initiated on February 2, 2015 (Docket No. 1), and the Second Amended Complaint, which is the current operative pleading, was filed on June 24, 2015 (Docket No. 24). The Second Amended Complaint brings claims for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. (the "ADA"); the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"); the Tennessee Disability Act, T.C.A. § 8-50-103 (the "TDA"), the Tennessee Human Rights Act, T.C.A. § 4-21-401 (the "THRA"); and the Tennessee Public Protection Act, T.C.A. § 50-1-304 (the "TPPA"). The Second Amended Complaint seeks compensatory damages, including back pay; reinstatement; a permanent injunction preventing

1

the defendant from engaging in employment practices that discriminate on the basis of age, gender, or disability; and attorney's fees and costs.[1]

On March 25, 2016, the Hospital filed a Motion for Summary Judgment, along with a Memorandum in support (with attached deposition transcripts), a Statement of Undisputed Material Facts, and the Declarations of Ryan Williams and Melanie Absher. (Docket Nos. 30-34.) The Hospital argues that Ms. Litts is unable to establish a *prima facie* case in support of any of her claims and, further, is unable to show that the Hospital's proffered reason for Ms. Litts' termination – a failed drug screen – is pretext.

On April 20, 2016, Ms. Litts filed a Response in Opposition, along with a Response to the Hospital's Statement of Undisputed Material Facts. (Docket Nos. 37, 38.) In her Response, Ms. Litts concedes that she is no longer pursuing a claim under the TPPA and advances only her claims that her termination was due to her age and her perceived disability. (Docket No. 37, pp. 1-2.)

On May 4, 2016 the Hospital filed a Reply. (Docket No. 41.)

## **THE UNDISPUTED FACTS**[2]

According to the undisputed facts in the record, Ms. Litts was employed by the Hospital as a Charge Nurse on the Inpatient Rehabilitation Unit (the "IRU"), beginning in 2001. Throughout her employment with the Hospital, Ms. Litts was subject to the Hospital's zero-tolerance Drug And Alcohol Free Workplace Safety Policy. Ms. Litts knew that, pursuant to this policy, the Hospital prohibited her from being under the influence of drugs and alcohol during

---

[1] While Ms. Litts asks for this injunctive relief to include a prohibition on gender discrimination, there is no gender discrimination claim at issue in this action, nor are there any allegations that Ms. Litts was terminated by the Hospital because she is a woman.

[2] The undisputed facts in this section are drawn from Ms. Litts' Response to the Hospital's Statement of Undisputed Material Facts (Docket No. 38).

working time or on Hospital premises. She also knew that the Hospital would require her to submit to an employee drug screen, if it had a reasonable suspicion that she was in violation of this policy, and that violations of the policy would result in immediate termination.

In is undisputed that, on April 16, 2014, Ms. Litts reported to work at the Hospital in order to attend a mandatory skills fair, and she clocked in when she arrived. Prior to leaving the Hospital that day, she decided to visit the IRU. Upon her arrival in the IRU, Ms. Litts began to feel "strange," including a tingling sensation down her spine, numbness, anxiety, and the sensation that her throat was closing. A coworker of Ms. Litts named Connie Roark noticed that she was not well. The Hospital's Medical Director, who also witnessed Ms. Litts' behavior, recommended that Ms. Litts report to the Hospital Emergency Department (the "ED") for further evaluation. Ms. Roark transported Ms. Litts to the ED in a wheelchair.

It is further undisputed that, whenever a Hospital employee is admitted to the ED following a report of erratic behavior at work, the ED staff is responsible for contacting the Nursing Supervisor to determine whether an employee drug screen needs to be conducted. Accordingly, when Ms. Litts arrived in the ED on April 16, 2014, an ED staff nurse contacted Nursing Supervisor Chris Hanton to ask if an employee drug screen needed to be conducted on Ms. Litts. Ms. Hanton then contacted her supervisor, Senior Nursing Director Penny Clark, for guidance, and Ms. Clark, in turn, contacted Human Resources Director Ryan Williams.

Meanwhile, according to the undisputed facts, upon learning that Ms. Litts had exhibited erratic behavior at work and been admitted to the ED, Ms. Litts' supervisor, IRU Director Brenda Sanders, returned to the Hospital from offsite. When she arrived, Ms. Sanders questioned Ms. Roark and another IRU employee, Katie McCall, about what had happened with Ms. Litts earlier that day. Ms. Roark and Ms. McCall reported to Ms. Sanders that, when Ms.

Litts had arrived at the IRU, she had been very unsteady and shaking, Ms. Roark and Ms. McCall had been afraid she was going to fall, and Ms. Litts had lain down on the nurses' station. Ms. Sanders then went to the ED to see Ms. Litts, and she has testified that "she had never seen [Ms. Litts] in a similar state before." (Docket No. 38 ¶ 15.) Ms. Sanders then reported to Mr. Williams her own observations of Ms. Litts, as well as the reports she had received from Ms. Roark and Ms. McCall. Following this conversation, Mr. Williams suspected that Ms. Litts was under the influence of drugs or alcohol, in violation of the Hospital policy.

As a result, Mr. Williams made the decision to require Ms. Litts to submit to a reasonable suspicion drug screen. Ms. Litts then submitted to two employee drug screens, one on April 16, 2015, and one on the next day, April 17, 2015.[3]

It is undisputed that, on April 21, 2015, Aegis, the Hospital's third-party drug testing company, reported to the Hospital that Ms. Litts had tested positive for Butalbital, a prescription drug for which Ms. Litts did not have a prescription. Further, it is undisputed that, upon receiving these results, Mr. Williams made the decision to terminate Ms. Litts' employment "for violating the Hospital's Drug and Alcohol Free Workplace Safety Policy effective April 22, 2014." (Docket No. 38 ¶ 21.)

---

[3] In her response to the Hospital's Statement of Undisputed Material Facts, Ms. Litts technically disputes that Mr. Williams decided to require her to submit to a reasonable suspicion employee drug test on April 16th and that she submitted to drug screens that day and the next. (Docket No. 38 ¶¶ 18-19.) Ms. Litts does not, however, cite to any facts in the record – nor is the court aware of any – that actually refute these assertions. Ms. Litts states only that she was in the ED as a patient at the time of her screen on the 16th, and that her treatment in the ED was purportedly covered by worker's compensation. (*Id.*) In the cited portion of her deposition, however, Ms. Litts admits that an ED nurse told her she was being given an "employee drug screen" ordered by the Hospital administration on the 16th. (Docket No. 31-1, pp. 126-130.) Elsewhere in her deposition, Ms. Litts admits that she submitted to that screen, and returned to the Hospital for another screen on the 17th, because she was aware that doing so was a condition of her employment and that refusing would have resulted in her termination. (*Id.* at 138:13-139:22; 144:13-159:2.) Accordingly, the court treats these facts as undisputed for purposes of the Motion for Summary Judgement.

4

## ADDITIONAL EVIDENCE OF MS. LITTS' AGE AND PERCEIVED DISABILITY

According to Ms. Litts' deposition testimony, she was born on February 11, 1958, meaning that she was 57 years old at the time she was terminated from her position. (Docket No. 31-1, 4:18-19.)

Ms. Litts states that her supervisor at the Hospital knew she had "chemical sensitivities," meaning that certain smells (including the smell of the chemicals used to strip the floors in the IRU in the weeks before she became ill on April 16th, as well as bleach, lilies, aerosol scents, kerosene, and certain perfumes, deodorants, and detergents) trigger headaches, wheezing, sinus inflammation, cough, and a throat closing sensation, which she claims she experienced on April 16th. (*Id*. at 20:24-26:5.) Ms. Litts concedes, however, that the only reasons the Hospital might have perceived her as disabled are her age and the fact that her *sister* had a massive heart attack in June of 2013, for which her sister was treated in the Hospital. (*Id*. at 229:25-231:5; 221:15-224:9.) Specifically, Ms. Litts asserts that her age might have caused the Hospital to believe that she could not keep up, and her sister's heart attack might have caused Ms. Litts' supervisors to think that Ms. Litts might be at risk of the same, based on family history. (*Id*.)

Ms. Litts admits, however, that no one at the Hospital ever said anything negative to her about her age or anything derogatory about her sister's heart attack. (*Id*. at 224:10-229:24.) There is no evidence in the record that Ms. Litts actually suffered from heart disease or that anyone at the Hospital believed she did. Moreover, Ms. Litts admits that there is truly no basis for anyone at the Hospital to have perceived her as disabled, mentally or physically, and that she has never been limited in performing her job in any way.[4] (*Id*. at 229:25-231:5.) Ms. Litts also

---

[4] In her deposition testimony, Ms. Litts recounts that her supervisor, Brenda Sanders, came to see her in the ED while she was there on the 16th and told Ms. Litts that she would be taken off the schedule for the weekend as a precaution, in case she needed to rest. (Docket No. 31-1, 123:1-

admits that she never requested to be removed from the work schedule on days when the floors were being stripped in her unit. (*Id*. at 26:1-28:12.) In fact, there is no evidence in the record that Ms. Litts was ever impacted by her chemical sensitivities, or by any other condition, in a way that limited her ability to do her job or to perform any life functions, nor that she was ever perceived to be limited.

While Ms. Litts asserts her belief that she would not have been terminated had she been under the age of 40 and not as far along in her career (because she would not have been earning as much), she admits that this is pure speculation unsupported by evidence.[5] (*Id*. at 224:10-229:24.) Ms. Litts also admits that, while she is anecdotally aware of other, older employees having been terminated from the Hospital around the same time she was, she has no information about the grounds for those terminations or other circumstances surrounding them. (*Id*. at 183:1-187:19; 224:10-229:24.) By her own admission, her belief that there is any connection between the terminations and the ages of the employees is, rather, based on nothing more than her own speculation. (*Id*.) Indeed, there are no facts whatsoever in the record concerning the circumstances surrounding the termination of any Hospital employees aside from Ms. Litts, nor is there any evidence about the number of Hospital employees overall, the number who have

---

126:22.) Ms. Litts does not, however, provide any evidence to support a finding that Ms. Sanders perceived Ms. Litts to be disabled at the time, nor is there any evidence in the record that Ms. Sanders removed Ms. Litts from the schedule due to a belief that she was unable to perform her job.

[5] Ms. Litts asserts in her deposition – again, based on pure speculation – that the Hospital's desire to get rid of employees who are older and earning the peak compensation and benefits for their positions would explain why her drug screenings occurred the way they did and led so quickly to her termination. (Docket No. 31-1, 224:10-229:24.) There is no evidence in the record, however, refuting the Hospital's assertion that Ms. Litts' drug screenings were ordered based on the behavior she exhibited in the IRU on April 16, 2014, or suggesting that anything other than the results of the drug screening was considered by Hospital administration in making the decision to terminate Ms. Litts.

been terminated over the previous years, the ages of terminated employees, or the ages of employees who have not been terminated or who have been hired to replace those that were. Moreover, Ms. Litts has placed no evidence in the record to show that anyone has replaced her, let alone the age of any such replacement. In fact, the Hospital has put forth evidence that Ms. Litts' position was never filled after she was terminated (Docket No. 24 (Deposition of Melanie Absher) ¶ 4), and Ms. Litts has placed no evidence in the record to rebut this.

## **ADDITIONAL EVIDENCE REGARDING MS. LITTS' DRUG SCREENING**

In her deposition testimony, Ms. Litts confirms her understanding that her employment at the Hospital was at-will, meaning she could be fired at any time without cause. (Docket No. 31-1, 100:12-109:7.) She further admits that the Hospital has a drug and alcohol free policy, which prohibits employee use of any alcohol or drugs (other than medications for which the employee has a prescription) on Hospital premises and provides that, if the Hospital has reason to suspect an employee is under the influence, it has the right to order a screen, and the employee will be terminated if the screen is failed. (*Id*.) Ms. Litts asserts her belief that her termination due to a failed drug screen was, nevertheless, improper for the following reasons: 1) the Hospital should not obtain records from an employee's treatment in the Hospital as a patient, 2) the Hospital should not call an employee in for a drug screen on the employee's day off, 3) an employee drug screen should have to take place on the same day as the suspicious behavior prompting the screen, 4) the Hospital should allow for a new drug screen with a new *sample* if one is requested by an employee following a failed drug screen, and 5) a positive drug screen should not lead to termination, where the employee denies that the result is accurate and has a good work history as a valuable employee. (*Id*.) Ms. Litts admits, however, that these are her beliefs about what the Hospital's policy *should* be, and they do not reflect the *actual* policy of the Hospital, which, to

7

the contrary, states only that an employee will be terminated for a positive test after being screened at any time and for any reason. (*Id*.) Ms. Litts further admits that the actual policy of the Hospital places no parameters on the timing of an employee drug screen and makes no provision for an employee to request follow-up screening on a new sample (though the policy does allow an employee to request a second test on the *same* sample, which is split at the time of collection), nor does the policy place any conditions on the provision that a failed screen will lead to termination. (*Id*.) Moreover, Ms. Litts' suggestion that her test on the 16th was based, not on the suspicious behavior she exhibited in the IRU, but on information the Hospital improperly obtained from the ED (Docket No. 31-1, 109:10-122:13) is unsupported by the evidence in the record and belied by Ms. Litts' own admissions. Ms. Litts admits that there is no evidence that the Hospital received any information from the ED about her treatment or test results while there as a patient and that it is pure speculation that the Hospital attempted to improperly access her medical files in order to find reason to terminate her. (Docket No. 31-1, 123:1-139:22.)

Additionally, Ms. Litts asserts that the paperwork prepared in connection with her April 16th drug screen violated Hospital policy by including her name, while she claims that the policy requires employee drug screens to be documented using social security numbers only, in order to preserve employee privacy. (Docket No. 31-1, 126:23-139:22.) She admits, however, that she signed the paperwork and submitted to the testing anyway. (*Id*.) She further states that, when the second test was done on the 17th, the paperwork was filled out properly. (*Id*. at 150:24-159:2.) A few days later, the independent medical review officer, Dr. Aukerman, called Ms. Litts to inform her that both samples had tested positive for Butalibital, a barbiturate, and give her the opportunity to disclose whether she was taking any barbiturates by prescription. (*Id*. at

138:20-149:15.) Ms. Litts responded that she was not and that she had never taken a barbiturate. (*Id*.)

Finally, Ms. Litts argues that the amount of Butalbital found in her system should not have been understood as a positive drug screen and that there are other explanations (such as Ibuprofen use) for this positive result, aside from her having actually taken Butalbital without a prescription. (*Id*. at 149:13-159:2.) Ms. Litts provides no support for these claims in the record, however, other than her own naked assertion at her deposition that she read these things in medical journals (which are not in the record). Ms. Litts also admits that the Hospital's policy provides no minimum threshold for the amount of drug in an employee's system that qualifies as a positive result but, rather, provides for zero tolerance.[6] (*Id*.) She further admits that the drug testing was conducted by Dr. Aukerman as an independent party and that he signed off on the test being positive for Butalbital and submitted that information to the Hospital after giving Ms. Litts an opportunity to provide a prescription for this drug, which she did not have. (*Id*.) Moreover, Ms. Litts admits that she never raised her concerns with the Hospital about the possibility of a false positive or an insufficient amount of Butalbital in her system to trigger a positive result. (*Id*. at 166:1-25.) In fact, Ms. Litts was aware that she was entitled to request a second test of the samples collected on the 16th and 17th at a different lab, but she chose not to do this because she did not want to pay for the expense (which would be reimbursed only if the outcome was different) and did not believe any of the labs on the list would perform the type of testing that would change the result or reveal that the initial testing result was a false positive.

---

[6] Even by Ms. Litts' own assertion, moreover, there has to be less than 200 nanograms of drug per milliliter of urine sample for a screen to be considered negative (Docket No. 31-1, 149:16-22), and her drug screen from the 16th showed 273 nanograms per milliliter of barbiturate (*id*. at 175:1-4).

9

(*Id*. at 149:13-159:2.)  Ms. Litts was also not interested in retesting unless the retest was performed on a new sample, which was not an option.  (*Id*.)

Ms. Litts admits that there is nothing else wrong with the way that the drug screens were conducted.  (Docket No. 140:24-143:14.)  Indeed, there is no evidence in the record that there was any tampering with the sample or that the Hospital had any basis to believe the test results to be inaccurate.

## SUMMARY JUDGEMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim.  Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims.  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

The record is devoid of any direct evidence of discrimination against Ms. Litts, on the basis of age or perceived disability. Claims for discrimination on the basis of age or disability under the ADEA, ADA, TDA, and THRA that are based on indirect, or circumstantial, evidence are analyzed employing the familiar burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (ADEA); *Blazek v. City of Lakewood, Ohio*, 576 F. App'x 512, 516 (6th Cir. 2014) (ADA); *Cardenas–Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (TDA); Tenn. Code Ann. § 4-21-311(e) (THRA).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination or retaliation based on some protected status or activity, such as age or disability. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005). If the plaintiff makes the required *prima facie* showing, "the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision at issue." *Id.* To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, a lawful, non-discriminatory or non-retaliatory reason for its decision. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703–04 (6th Cir. 2007). If the defendant is successful, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To make this

11

showing, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against [her]." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (internal quotation marks omitted).

As an initial matter, Ms. Litts is unable to establish even a *prima facie* case of age or disability discrimination. Absent direct evidence, a plaintiff must demonstrate the following in order to establish a *prima facie* case of employment discrimination under the ADA or TDA: 1) she is disabled; 2) she is otherwise qualified for the position, with or without accommodation; 3) she suffered an adverse employment decision; 4) the employer knew or had reason to know of her disability; and 5) the position remained open while the employer sought other applicants or replaced the plaintiff. *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011); *see also Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004) ("A claim brought under the [TDA] is analyzed under the same principles as those utilized for the [ADA]."). There is absolutely no evidence in the record that Ms. Litts is disabled under the ADA, which is defined as either a "physical or mental impairment that substantially limits one or more of the major life activities" or being perceived as having such an impairment. *Mahon v. Crowell*, 295 F.3d 585, 589-90 (6th Cir. 2002) (quoting 29 U.S.C. § 705(20)(A)). In order to assert a *prima facie* claim of discrimination based on a *perceived* disability under the ADA, a plaintiff must show that the defendant either mistakenly believed she has a physical impairment that substantially limits one or more major activities or mistakenly believes that an actual, non-limiting impairment of the plaintiff's substantially limits one or more major life activities. *See, e.g.*, *id. a*t 592.

Ms. Litts' disability discrimination claim is based solely on her argument that the Hospital perceived her to be disabled. In her Response in opposition to the Hospital's Motion for Summary Judgment, Ms. Litts does not advance the theory that she was perceived as disabled based on her age and/or her sister's heart attack but argues, instead, that the basis for her claim that the Hospital perceived her as disabled is that she became ill at work on April 16, 2014 and was subsequently taken off the schedule. Not only is this argument directly contradicted by Ms. Litts' own testimony that the Hospital did not perceive her to be mentally or physically disabled and that she was never unable to perform her job, but it is not sufficiently supported by any other evidence in the record. Ms. Litts' testimony shows only that her supervisors indicated concern about her immediate symptoms and the possibility that she might need to be out of work for a few days. There is no other evidence in the record to suggest that they thought she was in any way unable to perform a major life function for any length of time, or even that the perception that she was ill was passed along to the people who made the decision to terminate Ms. Litts' employment. In fact, the record suggests that the symptoms observed actually caused the Hospital to suspect, not that Ms. Litts was disabled, but that she was under the influence of drugs, as the Hospital administration then ordered a drug screen. There is no basis, as a matter of law, to find that Ms. Litts has established a *prima facie* case of disability discrimination.

Similarly, in order to establish a *prima facie* case of age discrimination under the ADEA or THRA, a plaintiff must show that she was over the age of 40; was terminated from a position she was otherwise qualified for; and that she was treated less favorably than similarly situated employees outside of her age range. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 510-11 (6th Cir. 2004) (ADEA); *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006) ("We apply the same analysis to age-discrimination claims brought under the THRA as those brought

13

under the ADEA"). While Ms. Litts is over age 40 and was terminated, she is not able to establish that she was qualified for her position, given her admission that the Hospital had a zero tolerance policy for drug use on the premises and that she had a positive result on an employee drug screen taken on April 16, 2015, after she was brought from the IRU to the ED. Moreover, there is no evidence whatsoever in the record to indicate that Ms. Litts was replaced by someone younger than she, or that there was any differential treatment of employees by the Hospital based on age.

The conclusory statement in Ms. Litts' Response that she was "replaced by a substantially younger employee, name unknown" (Docket No. 37, p. 5), with no citation to the record and no evidence in the record to support this assertion, is not sufficient to show that she was replaced by someone outside of her protected class or treated differently than others outside of her protected class. Nor does the fact that Ms. Litts has testified that other, older employees were terminated, on its own, support a *prima facie* case of discrimination, when Ms. Litts admittedly knows nothing about the circumstances surrounding those terminations and has put no information in the record to show that there was a pattern of terminating older employees. Ms. Litts' testimony amounts to nothing more than anecdotal observations and unsupported speculation. Again, Ms. Litts' conclusory assertion in her Response briefing that "[i]t was the custom of the Defendant to employ and favor younger nurses, because they received lower pay," with no citation to the record and appearing to reference only Ms. Litts' anecdotal observations in her testimony that other older employees had been terminated in the months leading up to her termination, does not, without more, provide a basis for a rational trier of fact to find a *prima facie* case of age discrimination.

Finally, even if Ms. Litts were able to establish a *prima facie* case of age or disability discrimination, she has proffered no evidence by which a rational trier of fact could find that the Hospital's stated reason for her termination – the failed drug screen – was pretext. A plaintiff may prove pretext by showing "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Pierson*, 749 F.3d at 539 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). Even if Ms. Litts is correct that – for some inexplicable reason – her positive drug screen results were in error, there is simply no evidence in the record to show that the Hospital tampered with these results, had reason to believe they were inaccurate, or otherwise did not rely on them in deciding to terminate Ms. Litts' employment. To the contrary, Ms. Litts admits that the failed drug screens were the basis for her termination, and there is no evidence in the record to refute this conclusion.

Moreover, Ms. Litts' testimony challenging the drug screen results consists only of the following: 1) her subjective belief that there was a false positive result that may have been caused by outside factors not considered by the tester; 2) her belief that the amount of barbiturate in her system should not have qualified as a positive result; and 3) her objections to the circumstances surrounding the testing, including the fact that the first was done while she was in the Hospital as a patient and with her name on the paperwork, and the second was ordered on her day off. There is no evidence, however, that the Hospital actually violated any of its own internal policies regarding drug screening, and Ms. Litts admits that her complaints are based on her own beliefs about what the policies should be, not what they actually are. Further, Ms. Litts' disagreement with the testing procedures used does not in any way undermine the clear evidence in the record demonstrating that the Hospital relied on the test results to find that Ms. Litts had

15

violated Hospital policy and that this was the basis for her termination. The testing was undisputedly conducted by a third-party tester, who concluded that the testing was positive, under the Hospital's zero-tolerance policy, for barbiturates for which Ms. Litts did not have a prescription and passed this report along to the Hospital. Ms. Litts never took advantage of the opportunity to have the testing redone, nor did she ever raise her concerns about the potential for a false positive test result or her opposition to the manner in which the testing was conducted with the Hospital administration.

Accordingly, the court finds that there is no basis for a trier of fact to find that the Hospital's stated reason for Ms. Litts' termination was pretext, and Ms. Litts' employment discrimination claims cannot survive summary judgment as a matter of law.

## **CONCLUSION**

For the reasons discussed herein, the Hospital's Motion for Summary Judgment will be granted, and Ms. Litts' claims will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge